IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Frank Szalay,<br><br>              Plaintiff,<br><br>vs.<br><br>Board of Supervisors, County of Pima, et al.,<br><br>              Defendants. | No. CV02-479- TUC-JMR (JCG)<br><br>**REPORT<br>& RECOMMENDATION** |

      Pending before the Court is Defendants' Motion for Summary Judgment filed on November 2, 2006. (Doc. No. 128.) Defendants move for summary judgment on Plaintiff's claims that he was unlawfully terminated in retaliation for exercising his First Amendment rights, that he was terminated without due process, and that his termination violated the Family Medical Leave Act ("FMLA"). Plaintiff filed a response on January 22, 2007 (Doc. No. 142) and Defendants timely replied. (Doc. No. 144.)

      Pursuant to the Rules of Practice in this Court, the matter was assigned to Magistrate Judge Guerin for a report and recommendation.[1] The Magistrate Judge

---

[1] This case was originally assigned to Judge Browning, then re-assigned to Judge Marquez (Doc. No. 84), then re-assigned to Magistrate Judge Carruth. (Doc. No. 88.) The parties elected assignment of the case to a district court judge and the case was re-assigned to Judge Roll (Doc. No. 95), who referred the matter to Magistrate Judge Guerin for a Report & Recommendation. (Doc. No. 97.)

recommends the District Court, after its independent review of the record, enter an order denying Defendants' motion for summary judgment in part and granting it in part.

**Factual and Procedural Background**[2]

The evidence presented by the parties shows the following facts: Plaintiff Frank Szalay worked for Pima County as a Utility Service Worker in the Wastewater Management Department from December 15, 1991 to May 23, 1997. (DSOF at ¶ 1-2.) On May 23, 1997, Plaintiff was placed on leave for an industrial injury. (DSOF at ¶ 2.) In April, 1998, Plaintiff was transferred to the Pima County Job Retraining and Placement Program ("the JRPP"). (DSOF at ¶ 6.) The JRPP is operated and maintained by Pima County's Risk Management Division. (DSOF at ¶ 4.) David Parker is the manager of the Risk Management Division. (DSOF at ¶ 5.) The purpose of the JRPP is to assist employees on industrial injury leave for at least one year and attempt to place those employees in other jobs within Pima County commensurate with their job restrictions. (DSOF at ¶ 7.) Once transferred to the JRPP, an employee has one year in which to find a job within Pima County. (DSOF at ¶ 8.) If an employee does not find a job by the end of one year, the employee is referred to Human Resources and is subject to lay off. (DSOF at ¶ 8.)

When Plaintiff was transferred to the JRPP, the program was being managed by Mary Tobey on an interim basis, pending the hiring of a permanent manager for

---

[2]LRCiv 56.1 requires a party opposing a motion for summary judgment to file a separate statement of facts "setting forth: (1) for each paragraph of the moving party's separate statement of facts, a correspondingly numbered paragraph indicating whether the party disputes the statement of fact set forth in that paragraph and a reference to the specific, admissible portion of the record supporting the party's position if the fact is disputed." Plaintiff did not comply with the requirements of LR Civ 56.1, and instead filed a Statement of Facts which presents the facts organized by deposition, rather than responding directly to Defendants' Statement of Facts or even presenting the facts in chronological order. This makes the Court's review of the record in this matter difficult.

the program. (DSOF at ¶ 11.) Plaintiff's wife, Annie Deering-Szalay, was hired as the manager of the JRPP in February, 1999. (DSOF at ¶ 12.) At that time, Plaintiff had not yet been placed in a job elsewhere in Pima County. (DSOF at ¶ 12.) Mrs. Deering-Szalay recognized that Plaintiff was nearing the end of his one-year eligibility for the JRPP; she sent Plaintiff for testing for the office support classification positions as a preliminary step toward placing Plaintiff in an office position. (DSOF at ¶ 13; PSOF Ex. 7, pgs. 98-101.)

In April, 1999, Mr. Parker instructed Mrs. Deering-Szalay to assign Plaintiff to a special project in the Risk Management Department ("the Risk Management Project"). (PSOF at ¶ 117; DSOF at ¶ 17.) The Risk Management Project consisted of creating a computerized catalogue of all County-owned properties with structures valued at more than $50,000 for insurance underwriting purposes. (DSOF at ¶ 17, 22.) Plaintiff returned to the active work force and was housed in Risk Management's County office. (DSOF at ¶ 19.) Mrs. Deering-Szalay supervised Plaintiff on the Risk Management Project. (PSOF at ¶ 118; DSOF at ¶ 20.) Due to the nature of the Risk Management Project, Plaintiff's employment on the project was a temporary position. (PSOF at ¶ 152.)

In working on the Risk Management Project, Plaintiff compiled a database using ACCESS software, which impressed Mrs. Deering-Szalay. (DSOF at ¶ 22.) Mrs. Deering-Szalay approached Joe Esak, a Senior Program Analyst in the Pima County Administration's office working on the Pima County Capital Improvement Project ("the CIP"). (DSOF at ¶ 23.) The CIP project involved the use and management of sophisticated programs to track the expenditure on the County capital improvement projects which had been authorized by the 1997 bond election. (DSOF at ¶ 24.) Mrs. Deering-Szalay asked Mr. Esak whether Plaintiff could be employed with the CIP. (DSOF at ¶ 27.)

Mr. Esak worked for Don Spiece, who was the manager of the CIP. (DSOF at ¶ 23.) Spiece, in turn, reported to County Administrator Chuck Huckleberry through Huckleberry's assistant, Jim Barry. (DSOF at ¶ 23.) Barry explained to Mrs. Deering-Szalay that Plaintiff could be placed in the CIP on the express conditions that the placement be a six-month trial period, in which Defendants could evaluate whether Plaintiff had sufficient computer skills to contribute to the CIP, and that Risk Management would fund Plaintiff's position. (DSOF at ¶ 28, 32.) Mr. Parker agreed to fund Plaintiff's employment with the CIP for six months based on Mrs. Deering-Szalay's representations to him that the CIP position would be permanent and funded by County Administration after the expiration of the six-month trial period. (DSOF at ¶ 35.)

Mr. Esak and Mr. Parker both explained to Plaintiff that the CIP position was an unclassified position, meaning that it would not entitle Plaintiff to the protections of the Pima County Merit System. (DSOF at ¶ 30, 37.) Plaintiff's previous jobs within the County had been classified positions. (PSOF at ¶ 59.) Mr. Parker also explained to Plaintiff that other, classified jobs were available to Plaintiff, but that those positions would pay a lower salary than the CIP position. (DSOF at ¶ 38.) Plaintiff accepted the CIP offer and began working on the CIP on January 16, 2000. (DSOF at ¶ 39.)

After Plaintiff began working on the CIP, Mr. Esak observed that Plaintiff did not have the necessary computer skills and could not perform at the level needed for the CIP. (DSOF at ¶ 42.) In early June, 2000, Mr. Esak informed Plaintiff and Mrs. Deering-Szalay that he would be recommending to Mr. Barry that Plaintiff not continue on the CIP after his six-month trial period expired. (DSOF at ¶ 44.) By early June, 2000, Plaintiff was already looking for other positions in the County.

1  (DSOF at ¶ 44.) On June 13, 2000, Mr. Esak recommended to Mr. Barry that Plaintiff
2  not be retained at the end of the six-month trial period.   (DSOF at ¶ 43.)

3        At Mrs. Deering-Szalay's request, Mr. Parker agreed to fund Plaintiff's salary
4  through the end of August, 2000 (an additional two months beyond his six-month trial
5  period) in order to give Plaintiff additional time to find another position within Pima
6  County.   (DSOF at ¶ 46.)   When Mr. Parker was unable to find any written
7  notification to Plaintiff that the funding for his position would end by August 31,
8  2000, he agreed to continue to fund Plaintiff's position until September 30, 2000.
9  (DSOF at ¶ 46.) On September 6, 2000, Plaintiff received a letter from Mr. Parker
10 indicating that his position would be terminated on September 30, 2000, due to lack
11 of funding. (DSOF at ¶ 47.)

12       On September 27, 2000, Plaintiff submitted an FMLA request to Mr. Parker.
13 (DSOF at ¶ 49.)   Mr. Parker instructed Plaintiff to speak to Mr. Spiece about
14 coordinating his request for FMLA leave for the last three days of his employment.
15 (DSOF at ¶ 49.) Plaintiff's employment with Pima County ended on September 30,
16 2000.   (DSOF at ¶ 50.)

17       Plaintiff attempted to appeal his termination to the Pima County Merit
18 Commission on October 3, 2000, but was informed that, because he was an
19 unclassified employee at the time he was terminated, the Merit Commission did not
20 have jurisdiction to consider his appeal.   (DSOF at ¶ 51.)

21       On September 20, 2002, Plaintiff filed a complaint against Defendants in the
22 United States District Court for the District of Arizona. (Doc. No. 1.)  On July 29,
23 2003, the Court ordered Plaintiff to amend his complaint.  (Doc. No. 29.)  Plaintiff
24 filed a First Amended Complaint on September 3, 2003. (Doc. No. 32.) On February
25 9, 2005, after the parties had engaged in over one year of disclosure and discovery,
26 Plaintiff moved for leave to amend his complaint. (Doc. No. 82.)  The motion was
27
28

1  granted (Doc. No. 85) and Plaintiff filed his Second Amended Complaint on February
2  14, 2005. (Doc. No. 83.)
3       Plaintiff claims that he was terminated not because of his unsatisfactory
4  computer skills but because he participated as a Republican representative on the
5  County's Logic and Accuracy Board from 1993 to 2002. (PSOF at ¶ 159.)  The
6  purpose of the Logic and Accuracy Board is to serve as the monitor of the vote
7  tabulation machines to assure that the voting machines accurately record and tabulate
8  the vote.  (DSOF at ¶ 53.)
9       Mitch Etter, the Pima County Election Director at the time, complained that
10 Plaintiff was often unprepared for test runs of the voting machines and that his lack
11 of preparedness often delayed testing, an issue that caused Etter to be irritated with
12 Plaintiff.  (DSOF at ¶ 55, 57, 60.) Plaintiff portrays his involvement with the Logic
13 and Accuracy Board differently: he claims that, during his participation on the Board,
14 he frequently expressed concerns regarding the voting procedures implemented by the
15 Elections Director and staff. (PSOF at ¶ 159.)  The most recent incident in which
16 Plaintiff complained about the County's election procedures appears to have occurred
17 in November, 1998, when Plaintiff made statements to the press that were critical of
18 the County's conduct during the election.  (PSOF at ¶¶ 169-170.)  Mrs. Deering-
19 Szalay stated in her deposition that David Parker referred to Plaintiff as "a pain in the
20 elections process" at the time he instructed Mrs. Deering-Szalay to place Plaintiff in
21 the Risk Management Project.  (PSOF at ¶ 118.)  Mrs. Deering-Szalay also stated in
22 her deposition that Jim Barry referred to Plaintiff as a "pain in elections" when he
23 agreed that Plaintiff could be placed in the CIP on the express conditions that the
24 placement be a six-month trial period. (PSOF at ¶ 130.)
25      Defendants moved for summary judgment on November 2, 2006.  (Doc. No.
26 128.)  This matter was not set for oral argument. *See Mahon v. Credit Bureau of*
27
28

*Placer County, Inc.,* 171 F.3d 1197, 1200 (9th Cir. 1999) (explaining that if the parties provided the district court with complete memorandum of law and evidence in support of their positions, ordinarily oral argument would not be required).

**Summary Judgment Standard**

In deciding a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the party opposing the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987).

Summary judgment is appropriate if the pleadings and supporting documents "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party moving for summary judgment initially must demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 325. The moving party merely needs to point out to the Court the absence of evidence supporting its opponent's claim; it does not need to disprove its opponent's claim. *Id.*; *see also* Fed. R. Civ. P. 56(c).

If a moving party has made this showing, the nonmoving party "may not rest upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). *See also Anderson*, 477 U.S. at 256; *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995). The nonmoving party may not "replace conclusory

allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990).

## Discussion

Plaintiff's Second Amended Complaint alleges twelve counts. (Doc. No. 83.) Defendants argued in their Motion that Plaintiff's Second Amended Complaint is confusing and that discovery has revealed that Plaintiff's allegations actually consist of three claims: (1) Plaintiff was unlawfully terminated in retaliation for exercising his First Amendment rights (Counts 1, 3, 4 & 7), (2) Plaintiff was terminated without due process (Counts 2, 6, 8, 9, 10, 11 and 12), and Plaintiff's termination violated the Family Medical Leave Act (Count 5). Plaintiff does not disagree with Defendants' categorization of his claims.

Defendants argue that they are entitled to summary judgment on all of Plaintiffs' claims because (1) Plaintiff has not produced evidence to support his retaliation claim, (2) Plaintiff was not entitled to the due process protections afforded by the Pima County Merit System, and (3) Plaintiff's claim that he was terminated in violation of the Family Medical Leave Act is without legal merit.

**(1) Plaintiff has not produced sufficient evidence to support his retaliation claim**

In order to establish a prima facie case of retaliation under the First Amendment, Plaintiff must show that: (1) he engaged in protected speech; (2) Defendants took an "adverse employment action" against him; and (3) his speech was a "substantial or motivating" factor for the adverse employment action. *Thomas v. City of Beaverton*, 379 F.3d 802, 808-09 (9th Cir. 2004) (citing *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir.2003)). In the present case, it is undisputed that Plaintiff engaged in a protected activity by acting as the Republican representative to the Logic and Accuracy Board of the County's election division. It is also undisputed that Plaintiff suffered an adverse employment action when he was terminated from

his employment as an unclassified employee in the CIP. Defendants contend, however, that Plaintiff's speech was not a "substantial or motivating" factor for the adverse employment action.

The causation element of a retaliation claim can be proven one of three ways. First, Plaintiff can introduce evidence regarding the "proximity in time between the protected action and the allegedly retaliatory employment decision," from which a jury logically could infer that the plaintiff was terminated in retaliation for his speech. *See Coszalter*, 320 F.3d at 977 (citing *Keyser v. Sacramento City Unified School District*, 265 F.3d 741 (9th Cir.2001) (as amended)). Second, Plaintiff can introduce evidence that "his employer expressed opposition to his speech, either to him or to others." *Id*. Third, Plaintiff can introduce evidence that "his employer's proffered explanations for the adverse employment action were false and pre-textual." *Id*. Whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances. *See Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003). "In some cases, the totality of the facts may form such a clear picture that a district court would be justified in granting summary judgment, either for or against a plaintiff, on the issue of retaliatory motive." *Id*. After reviewing the evidence offered by Plaintiff, the Magistrate Judge concludes that this is one such case.

  *a.*  *Proximity in time*

Timing alone cannot prove causation unless the adverse employment action occurred "fairly soon after the employee's protected expression." *Villiarimo v. Aloha Island Air, Inc*., 281 F.3d 1054, 1065 (9th Cir. 2002) (citation omitted). Plaintiff participated in the Logic and Accuracy Board from 1993 to 2002. (PSOF at ¶ 159.) During his participation in the Board, Plaintiff expressed concerns regarding the voting procedures implemented by the Elections Director and staff. (PSOF at ¶ 159.)

1  The most recent incident in which Plaintiff complained about the County's election
2  procedures appears to have occurred in November, 1998, when Plaintiff made
3  statements to the press that were critical of the County's conduct during the election.
4  (PSOF at ¶¶ 169-170.)  Plaintiff was assigned to his position with the CIP in January
5  2000, and was informed in early June, 2000 that his position with the CIP would be
6  coming to an end, although Plaintiff was not officially notified of his termination until
7  September 6, 2000.[3]  (DSOF at ¶ 35, 44, 47.) Nineteen months passed between
8  Plaintiff's protected activity and the adverse employment action - his termination.  A
9  nineteen-month gap between the alleged protected activity and the alleged adverse
10 employment action is too long a time to prove causation, as a matter of law. *See id.*
11 (stating that a nearly 18-month lapse between protected activity and an adverse

---

[3] Plaintiff suggests, but does not explicitly argue, that he suffered an adverse employment action in April, 1999 when Parker instructed Deering-Szalay to assign Plaintiff to the Risk Management Project rather than leave him in the job training program until a permanent placement became available. (Plaintiff's Response at pgs. 3, 6, 10-11.) The Ninth Circuit has adopted the EEOC definition of "adverse employment action," an "expansive view" which recognizes not only "ultimate employment actions" such as hiring, firing, promoting and demoting, but also actions which materially affect the terms and conditions of employment and "any adverse treatment . . . reasonably likely to deter the charging party or others from engaging in protected activity," as adverse employment actions. *See Ray v. Henderson*, 217 F.3d 1234, 1242-43 (9th Cir. 2000). Under this rule, lateral transfers, unfavorable job references, and changes in work schedules are all regarded by the Ninth Circuit as reasonably likely to deter employees from engaging in protected activity. *See id.* If Plaintiff could demonstrate that Defendants denied Plaintiff a permanent placement for which he was qualified and instead assigned him to temporary employment in the Risk Management Project, such conduct might constitute an adverse employment action. In the present case, however, there is no evidence to support Plaintiff's assertion that Mrs. Deering-Szalay was in the "final steps" of placing Plaintiff in a permanent position when Defendants instructed Mrs. Deering-Szalay to place Plaintiff in the Risk Management Project or that the temporary placement negatively affected the Plaintiff in any way. Mrs. Deering-Szalay testified that she could not recall where she was in the process of placing Plaintiff in a permanent position and she could not recall whether she had selected a permanent position for Plaintiff. (PSOF Ex. 7, pgs. 98-101.)

employment action is simply too long, by itself, to give rise to an inference of causation).

   *b.*  *Evidence that Plaintiff's employer expressed opposition to his speech*

  The strongest evidence Plaintiff presents is Mrs. Deering-Szalay's testimony that Jim Barry referred to Plaintiff as a "pain in elections" when he agreed that Plaintiff could be placed in the CIP on the express conditions that the placement be a six-month trial period.[4] (PSOF at ¶ 130.)   However, the strength of this evidence is diluted by the fact that it was Mr. Esak who recommended that Plaintiff not be continued in the CIP position after he observed that Plaintiff lacked the necessary skills to complete work that needed to be done and the fact that Mr. Esak was unaware of Plaintiff's protected speech.  (PSOF at ¶ 31; PSOF, Attachment 2, p. 28, l. 20-23.)  Moreover, Plaintiff does not dispute that he lacked the skills necessary for the CIP position.

   *c.*  *Evidence that Defendants' proffered explanations for the adverse employment action were false and pre-textual*

Plaintiff does present any evidence to suggest that Defendants' proffered explanations for the adverse employment action were false or pretextual.  On this issue, Plaintiff's Response includes only a difficult-to-decipher paragraph which reads "In addition, there is substantial evidence of pretext as evidenced by the testimony of Ms. Szalay, Parker Esak [sic], Etter and Huckleberry.  How is it that the very promotion that Huckleberry stated under oath would not occur, does, but is coupled with the mandatory relinquishment of all merit system rights?  These events are not

---

[4] Plaintiff also alleges that Defendant David Parker expressed opposition to his speech: Mrs. Deering-Szalay stated in her deposition that David Parker also referred to Plaintiff as "a pain in the elections process." (PSOF at ¶ 118.)  This comment was allegedly made by David Parker at the time he instructed Mrs. Deering-Szalay to place Plaintiff in the Risk Management Project, months before Mrs. Deering-Szalay sought out a position for Plaintiff in the CIP, and therefore is not relevant to Plaintiff's termination from his position in the CIP.

the product of mere coincidence. No other employee before or since has been treated the way in which Mr. Szalay was." (Plaintiff's Response, pg. 12.) Plaintiff does not present any evidence to suggest that the reason he was terminated from the CIP – because he lacked the necessary skill sets – was false, or that Defendants were not even-handed in the manner in which they managed employees unable to perform the duties of their jobs. *See Coszalter*, 320 F.3d at 979 (stating that plaintiff may demonstrate pretext by presenting evidence of inconsistent application of a policy).

Plaintiff attempts to avoid the evidentiary deficiencies by alleging a complicated scheme to remove him. Plaintiff claims that his participation on the Logic and Accuracy Board led to his termination when his supervisors, displeased with Plaintiff's protected speech, forced him into an unclassified position where his continued employment became subject to the whim of Jim Barry. (Plaintiff's Response, pg. 10.) Plaintiff, however, fails to point to any evidence which would support the existence of such a scheme.

First, there is no evidence that Plaintiff was lured into or forced into an unclassified position. Plaintiff admits that his placement in the CIP was through the JRPP (PSOF at ¶ 13) and does not deny that his wife approached Esak, requesting that Plaintiff be placed in that position.[5] (DSOF at ¶ 27.) Second, it is undisputed that

---

[5] Plaintiff appears to suggest that Barry sought out the CIP position for Plaintiff, citing Barry's testimony that "he believes that he is the one who initiated the potential placement [w/ CIP]." (PSOF 1.) This suggestion is unsupported by the record and the testimony is taken out of context. In the transcript, it is clear that Barry was explaining how he explored whether and under what conditions such a position could be created. He stated that he "was willing to seek a placement for Frank under the expressed condition that we had to see whether a position could be created that fit his skill level and allowed him to contribute to the CIP unit." (PSOF, Attachment 1, p. 6, l. 6-21.) In fact, Barry was never directly asked at his deposition if he initiated the idea of creating a position for Plaintiff in the CIP. The testimony cited by Plaintiff that he "initiated the possibility of Frank going to work for the CIP unit," was in response to a question as to how he disagreed with Annie Deering-Szalay's testimony regarding Frank's coming to work and whether it was probationary and whether there was an exchange of information on the

Plaintiff was told that the position was not classified (DSOF at ¶ 30, 37), and that other, classified jobs were available to him, but that those positions would pay a lower salary than the CIP position. (DSOF at ¶ 38.) Third, although Plaintiff claims that his job was subject to the whim of Jim Barry, his supervisor was Joe Esak. (PSOF 23.) Esak's undisputed testimony was that, after three months of observing Plaintiff, Esak determined that Plaintiff did not have the skills necessary for the position. (PSOF 31.) Esak had no relationship with the Election Bureau of the county at any time; he had never reviewed the Plaintiff's industrial commission file; he knew nothing about the JRPP (PSOF, Attachment 2, p. 24, l. 15-21, 26); and no one had mentioned to him Plaintiff's duties in connection with the county elections. (PSOF, Attachment 2, p. 28, l. 20-23.)   Esak testified that Barry had told him to observe Plaintiff and in essence to let him sink or swim on his own. (PSOF at ¶ 37.) Furthermore, the undisputed testimony was that Barry did not know that terminating the Plaintiff from CIP would result in his termination from employment with Pima County. (PSOF at ¶ 15.)

In addition, Plaintiff's own job search prevents the formation of a causal link between Defendants' actions and Plaintiff's termination: Plaintiff was looking for other jobs within the County before he received notice that his position in County administration would no longer be funded. (DSOF at ¶ 44.) Plaintiff was given the period of June, 2000 to September, 2000 to look for other jobs within the County. (DSOF at ¶ 46.) If Plaintiff had found another job within the County, he would not have suffered an adverse employment action. Plaintiff was looking for a job within the County even before he was notified that the funding would not be extended for his CIP position. (DSOF ¶ 44.) Because there is no evidence that Defendants impeded Plaintiff's job search, Plaintiff cannot prove a causal link between his protected

---

matter.  (*Id.*, p. 5, l. 20 - p. 7, l. 3.)   Significantly, it is undisputed, and the evidence shows, that it was Mrs. Deering-Szalay who approached Esak about a position for Plaintiff in the CIP.  (DSOF 23-27.)

activity and his termination. Plaintiff's claim that his supervisors conspired to terminate him from employment by forcing him into a temporary, unclassified position is not supported by sufficient evidence in the record to present the issue to a jury.

In sum, having reviewed the undisputed evidence and making all inferences from that evidence in Plaintiff's favor, the Magistrate Judge concludes that Plaintiff has not presented sufficient evidence of retaliatory motive to withstand Defendants' Motion for Summary Judgment on Plaintiff's claim that he was terminated in retaliation for exercising his First Amendment rights, in violation of § 1983 (Counts 1, 3, 4 & 7).

**(2)   Plaintiff was not entitled to the due process protections afforded by the Pima County Merit System**

In order to state a claim for denial of procedural due process, Plaintiff must allege facts showing that the Defendants deprived him of a property interest and that Defendants did so without due process of law. *See Brewster v. Board of Educ. of Lynwood Unified School Dist.*, 149 F.3d 971, 983 (9th Cir. 1998) (citing *Gearhart v. Thorne*, 768 F.2d 1072, 1073 (9th Cir.1985)). At the time of his termination, Plaintiff was employed in County administration in an unclassified position.[6] Defendants argue that, because Plaintiff was employed in an unclassified position and could be terminated at will, he did not have a property interest in his employment.

Property interests are broad and are created and their dimensions defined by existing rules or understandings which stem from an independent source such as state law. *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). Under Arizona law, a public employee who serves at the pleasure of the appointing authority may be

---

[6]An unclassified position is a position which is not covered by the Pima County Merit System.

terminated at will, and therefore does not have a property interest in his employment. *See Guy v. Mohave County*, 701 F.2d 73, 77 (Ariz. App. 1982). Unclassified Pima County employees are not entitled to the termination and grievance procedures set forth in the Pima County Merit System Rules, which means they may be terminated at will. *See* Pima County Merit System Rule 2.1; *see also Demasse v. ITT Corp.*, 194 Ariz. 500, 505, 984 P.2d 1138, 1143 (1999) (stating that, under Arizona common law, employment contracts are presumed to be at-will). Accordingly, as an unclassified employee, Plaintiff did not have a property interest in his employment.

Plaintiff concedes that, as an unclassified employee, he did not have a property interest in his employment. (Plaintiff's Response, pg. 16.) Plaintiff contends, however, that he was coerced into accepting an unclassified position in County administration, although Plaintiff does not cite to any authority in support of his argument that a formerly-classified employee who is coerced into an unclassified position has a property interest in his employment.

Plaintiff's argument amounts to a claim that he accepted Defendants' offer of unclassified employment in the CIP under duress. Because it is, in essence, an argument sounding in contract, the Court must consider it under Arizona law. *See Huey v. Honeywell, Inc.*, 82 F.3d 327 (9th Cir. 1996) (applying Arizona law to breach of employment contract claim filed by Arizona employee). Under Arizona law, duress exists if one party is induced to assent to a contract by a wrongful threat or act of the other party. *See Frank Culver Elec., Inc. v. Jorgenson*, 136 Ariz. 76, 77-78, 664 P.2d 226, 227-28 (App.1983). Normally, duress does not exist merely because one party takes advantage of the financial difficulty of the other. *See USLife Title Co. v. Gutkin*, 152 Ariz. 349, 356-57, 732 P.2d 579, 586-87 (App.1986); *Frank Culver Elec., Inc.*, 136 Ariz. at 78, 664 P.2d at 228. Duress is more likely to be proven when the wrongful act of one party is the very thing that created the other party's financial

difficulty. *Inter-Tel, Inc. v. Bank of America, Arizona*, 195 Ariz. 111, 117, 985 P.2d 596, 602 (App., 1999).

In the present case, the only evidence presented by Plaintiff in support of his duress argument is a declaration provided by Plaintiff after his deposition was taken and after the filing of Defendants' Motion for Summary Judgment. (Plaintiff's Response, pg. 4.) Defendants have objected to the admissibility of the declaration, claiming that it is "nothing more than an attempt to change his testimony for the better." (Defendants' Reply, pg. 10, n.6.) However, even if the Court considers the declaration, it does not create a material issue of fact on the issue of duress.

In his declaration, Plaintiff states that he felt compelled to accept the unclassified position because he was told by Mr. Parker that if he did not accept it, his employment with Pima County would terminate. (PSOF at ¶ 153.) As a threshold matter, the Court questions the veracity of this statement. Plaintiff did not dispute evidence presented by Defendants that, at the time Plaintiff was offered the unclassified position with the CIP, Mr. Parker told him that there were other, classified positions available to Plaintiff, but that they would pay a lower salary than the CIP project.[7] (DSOF at ¶ 38.) Moreover, Plaintiff's claim in his declaration that refusal to accept the CIP position would result in a layoff is inconsistent with the undisputed evidence that Plaintiff was told that other, classified jobs were available to him. In addition, even if Plaintiff's declaration were accepted, it would, by itself, be insufficient to prevent entry of summary judgment. Uncorroborated, self-serving testimony is insufficient to create an issue of material fact. *Villiarimo v. Aloha Island*

---

[7] Pursuant to LRCiv 56.1, "each numbered paragraph of the statement of facts set forth in the moving party's separate statement of facts shall, unless otherwise ordered, be deemed admitted for purposes of the motion for summary judgment if not specifically controverted by a correspondingly numbered paragraph in the opposing party's separate statement of facts."

1 *Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002).[8] Thus, based on the undisputed facts
2 presented to the Court, it does not appear that Plaintiff had no choice but to accept the
3 CIP position.
4        Even if, however, Plaintiff was informed that he would be laid off unless he
5 accepted the CIP position, that fact alone would not prove duress, because Plaintiff
6 would not have been in a financially-challenged position as the result of Defendants'
7 conduct. In May, 1997, Plaintiff was placed on administrative leave for an industrial
8 injury. (DSOF at ¶ 2.) In April, 1998, Plaintiff was transferred to the JRPP. (DSOF
9 at ¶ 6.) Once transferred to the JRRP, an employee has one year to find a job within
10 Pima County. (DSOF at ¶ 8.) If the employee does not find a job by the end of one
11 year, the employee is subject to lay off. (*Id.*) In April, 1999, Plaintiff was moved
12 from the JRPP to a temporary assignment with the Risk Management Project, where
13 he worked until January, 2000, when he was offered the unclassified position with the
14 CIP. (DSOF at ¶¶ 19, 21.) Thus, if Plaintiff had not accepted the CIP position or
15 found another County job, his one-year eligibility with the JRPP would have expired
16 and he would have been laid off when his temporary assignment to the Risk
17 Management Project ended. There is no evidence to suggest that Defendants'
18 maneuvered Plaintiff into a position of financial weakness and then took advantage
19 of Plaintiff's position by attempting to force Plaintiff to surrender his legal rights.
20 Accordingly, there is no support for Plaintiff's argument that he should be entitled to
21 the protections of the Pima County Merit System.

---

24     [8]Notably, Plaintiff's declaration is inconsistent with his deposition testimony in significant respects. For example, in his declaration, Plaintiff suggests he was unaware
25 that his performance in the CIP would be evaluated at six months. (PSOF, Ex. 8, ¶ 14.)
26 At deposition, Plaintiff testified that Mrs. Deering-Szalay told him, at the time of his transfer to the CIP, that Barry hoped Plaintiff didn't make it through probation and that
27 meant he'd have to be on good behavior. (PSOF, Ex. 9, ¶ 61, l. 15-22.)

Because Plaintiff concedes that he did not have a property interest in his employment at the CIP absent a finding of duress, and because there is no evidence in the record from which a jury could find duress, Plaintiff cannot state a claim for procedural due process. Defendants are entitled to summary judgment on Counts 2, 6, 8, 9, 10, 11 and 12.

**(3)    Plaintiff's claim that he was terminated in violation of the Family Medical Leave Act is without legal merit**

The FMLA entitles eligible employees to take a total of twelve weeks of leave during a twelve-month period due to "a serious health condition that makes the employee unable to perform the functions of the position of such employee." 29 U.S.C. § 2612(a)(1)(D). The Act creates a private right of action to seek both equitable relief and money damages "against any employer (including a public agency) in any Federal or State court of competent jurisdiction," 29 U.S.C. § 2617(a)(2), should that employer "interfere with, restrain, or deny the exercise of" FMLA rights. 29 U.S.C. § 2615(a)(1).

Plaintiff received notice of his termination on September 6, 2000, when he received a letter stating that his employment would terminate on September 30, 2000. (DSOF at ¶ 47.) On September 27, 2000, Defendants received FMLA paperwork from Plaintiff, and directed Plaintiff to speak to the supervisor of the CIP in order to coordinate his request for FMLA leave for the remaining three days of his employment. (DSOF at ¶ 49.) In his Second Amended Complaint, Plaintiff alleged that he was improperly denied his FMLA rights because Defendants "refus[ed] to restore Plaintiff to the position held before leave, den[ied] him benefits and discharg[ed] him." (Second Amended Complaint, pg. 6.)

Defendants initially construed Plaintiff's FMLA claim as a claim that Plaintiff's request for FMLA leave should have extended his employment beyond his September 30, 2006 termination date, and argued that such a claim was not supported by law.

In his response, however, Plaintiff clarified the nature of his FMLA claim, stating if the Court concludes that Szalay was wrongfully terminated, such a finding would restore his right to the requested FMLA leave.

Plaintiff's argument fails, however, because Plaintiff has not presented any evidence that Defendants "interfere[d] with, restrain[ed], or den[ied] the exercise of" Plaintiff's FMLA rights as required by § 2615(a)(1). The only evidence before the Court related to the FMLA claim appears in Defendants' Statement of Facts: on September 27, 2000, Defendant received FMLA paperwork from Plaintiff, and directed Plaintiff to speak to the supervisor of the CIP in order coordinate his request for FMLA leave for the remaining three days of his employment. (DSOF at ¶ 49.) Plaintiff's Response does not cite to any portion of the record indicating that Plaintiff spoke with his supervisor as directed and was denied leave, nor can the Court find any such evidence in its review of the record.[9] Thus, even if Plaintiff demonstrates that he was wrongfully terminated, he is not entitled to restoration of his requested FMLA leave, because he has not demonstrated that such leave was requested and improperly denied. Accordingly, Defendants are entitled to summary judgment on Count 5.

**Recommendation**

For the foregoing reasons, the Magistrate Judge recommends the District Court, after its independent review of the record, enter an order:

1. GRANTING IN PART AND DENYING IN PART Defendants' Motion for Summary Judgment (Doc. No. 128);
2. Granting summary judgment in favor of Defendants on Counts 2, 5, 6, 8, 9, 10, 11 and 12;

---

[9]LRCiv 56.1 provides that "memoranda of law filed in support of or in opposition to a motion for summary judgment, including reply memoranda, shall include citations to the specific paragraph in the statement of facts that supports factual assertions made in the memoranda."

3. Ordering that Defendants are not entitled to summary judgment on Counts 1, 3, 4 & 7.

Pursuant to 28 U.S.C. § 636(b), any party may serve and file written objections within 10 days of being served with a copy of this Report and Recommendation. Any objections filed should use the following case number: CV02-479-TUC-JMR. If objections are not timely filed, they may be deemed waived.

DATED this 22nd day of August, 2007.

_____
Jennifer C. Guerin
United States Magistrate Judge