**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Frank Szalay, ) | |
| ) | |
| Plaintiff, ) | No. CV02-479- TUC JMR |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| Board of Supervisors, County of Pima, ) et al., ) | |
| ) | |
| Defendants. ) | |
| ) | |

      This action arises from Defendants' Motion for Summary Judgment on Plaintiff's claims that he was unlawfully terminated in retaliation for exercising his First Amendment Rights, that he was terminated without due process, and that his termination violated the Family Medical Leave Act ("FMLA").

*Background*

      Plaintiff, Frank Szalay, was employed by Pima County as a Utility Service Worker in the Wastewater Management Department from December 15, 1991, to May 23, 1997. In April, 1998, after sustaining an on the job industrial injury, Plaintiff was transferred to the Pima County Job Retraining and Placement Program ("JRPP"). The JRPP is operated and maintained by the Pima County Risk Management Division and is managed by David Parker. It's goal is to help employees that have suffered industrial injuries find other employment within Pima County that is commensurate with their job restrictions.

-1-

An employee that has been transferred to the JRPP has one year to find new employment. If an employee is unsuccessful, that employee is referred to Human Resources and is subject to lay off.

Mary Tobin was the JRPP's interim manager when Plaintiff was transferred. In February, 1999, Plaintiff's wife, Annie Deering-Szalay, was hired as the JRPP's full-time manager. At the time, Plaintiff was nearing the end of his one year period and had yet to find other employment within Pima County. Recognizing this fact, Ms. Deering-Szalay sent Plaintiff to be tested for the office support classification positions as a step toward securing Plaintiff an office job.

In April, 1999, Mr. Parker told Ms. Deering-Szalay to place Plaintiff in a special project in the Risk Management Department ("the Risk Management Project"). The Risk Management Project consisted of creating a computerized inventory of all County-owned properties with structures valued in excess of $50,000 for insurance underwriting purposes. Plaintiff returned to work in the Risk Management's County office and was supervised by Ms. Deering-Szalay. Due to the nature of the Risk Management Project, Plaintiff's employment was only on a temporary basis.

Ms. Deering-Szalay was impressed with Plaintiff's work with the Risk Management Project and wished to find him a permanent position where he could utilize his computer skills. Ms. Deering-Szalay approached Joe Esak, a Senior Program Analyst in Pima County's Administration office working on the Pima County Capital Improvement Project ("the CIP") about the possibility of the CIP employing Plaintiff.

The CIP involved the use and management of complicated computer programs to monitor the expenditure on county capital improvement projects authorized by the 1997 bond election.

Mr. Esak spoke to CIP manager Don Spiece, who spoke to Jim Barry, County Administrator Chuck Huckleberry's assistant, about the possibility of employing Plaintiff in the CIP. Mr. Barry told Ms. Deering-Szalay that Plaintiff could take a position in the CIP for a six-month trial period. At the end of the trial period, Plaintiff's performance would be evaluated to ascertain if he had the necessary computer skills to continue in the position on a long-term basis. Mr. Barry also told Ms. Deering-Szalay that Risk Management would have to fund Plaintiff's position. Mr. Parker agreed to Mr. Barry's conditions based on Ms. Deering-Szalay's representations that the CIP position was permanent and that the County Administration would take over funding after six-months.

Plaintiff was told by both Mr. Esak and Mr. Parker that the CIP position was an unclassified position and that he would no longer be entitled to the protections provided by the Pima County Merit System. All of Plaintiff's prior Pima County positions were classified. Plaintiff was also informed that if he did not want the unclassified CIP position there were other classified positions available in the county that did not pay as much. Plaintiff accepted the position and began working on January 16, 2000.

During the course of Plaintiff's employment at CIP, Mr. Esak concluded that Plaintiff's computer skills were not sufficient to justify long-term employment with the CIP. In early June, 2000, Mr. Esak informed Plaintiff and Ms. Deering-Szalay that he

would be recommending to Mr. Barry that at the end of the six-month term Plaintiff should not be offered a full-time position.  By early June, Plaintiff was already looking for other employment within Pima County.  On June 13, 2000, Mr. Esak recommended to Mr. Barry that Plaintiff should not be retained.   Mr. Parker, at Ms. Deering-Szalay's request, continued to fund Plaintiff's position for an additional two months, through August, 2000, in order to allow Plaintiff to find new employment.  Mr. Parker then extended Plaintiff's employment through the September 30, 2000 because he was unable to find proof of timely written notification to Plaintiff that the funding for his position would end.  On September 6, 2000, Plaintiff received a letter from Mr. Parker indicating that his position with the CIP would be terminated due to lack of funding on September 30, 2000.

On September 27, 2000, Plaintiff submitted a FMLA request to Mr. Parker.  Plaintiff was told to ask Mr. Spiece about coordinating his request for FMLA leave for the last three days of his employment.  Plaintiff's employment with Pima County ended on September 30, 2000.

Plaintiff attempted to appeal his termination to the Pima County Merit System but his request was denied because as an unclassified employee, the merit system lacked jurisdiction.

On September 20, 2002, Plaintiff filed a complaint against the Defendants in the United States District Court for the District of Arizona.  (Doc. No. 1.)  On July 29, 2003, the Court ordered Plaintiff to amend his complaint.  (Doc. No. 29.)  On September 3,

2003, Plaintiff filed a First Amended Complaint. (Doc. No. 32.)   On February 9, 2005, after the parties had engaged in over a year of disclosure and discovery, Plaintiff moved for leave to amend his complaint. (Doc. No. 82.) This motion was granted (Doc. No. 85.) and Plaintiff filed his Second Amended Complaint on February 14, 2005.  (Doc. No. 83.)

Plaintiff claims that his CIP position was terminated not because of his insufficient computer skills but because of his role as the Republican representative on the County's Logic and Accuracy Board from 1993 to 2002.  The purpose of the Logic and Accuracy Board is to monitor the county's voting machines to ensure that they record and tabulate votes correctly.

There are varying accounts of Plaintiff's performance on the board.  Pima County's Election Director complained that Plaintiff was often unprepared for test runs of the machines and this often lead to delayed tests.  Conversely, Plaintiff claims that while serving on the board, he frequently voiced his concerns regarding the voting procedures utilized by the Election Director and his staff.  The last of these statements occurred in November, 1998, when Plaintiff made critical comments to the press about the County's conduct during the election.  In her deposition, Mrs. Deering-Szalay stated that on the day that Mr. Parker told her to place Plaintiff in the Risk Management Project he referred to Plaintiff as a "pain in the election process".  Mrs Deering-Szalay also stated in her deposition that on the day that Mr. Barry agreed to place Plaintiff in the CIP he referred to Plaintiff as a "pain in elections".

On November 2, 2006, Defendant moved for Summary Judgment on Plaintiff's

claims that he was unlawfully terminated in retaliation for exercising his First Amendment Rights, that he was terminated without due process, and that his termination violated FMLA.  (Doc. No. 128.)  This matter was referred to Magistrate Judge Jennifer C. Guerin.  On August 22, 2007, the Magistrate Judge filed a Report and Recommendation ("R&R") (Doc. No. 145) recommending that this court partially grant the Defendant's motion.  On September 5, 2007,  the Magistrate Judge filed an Amended R& R (Doc. No. 147)  recommending that this court grant Defendant's motion in full.  For the reasons stated below, the R&R is adopted in part and rejected in part.

*Legal Standards*

A district court shall conduct a de novo review of those parts of an R&R to which objections are filed within ten days of the R&R.  28 U.S.C. § 636(b); Fed. R. Civ. P. 72(b).  The district court may either accept, reject, or amend all or any portion of the R&R.  *Id*.  If the parties do not object to the magistrate judge's R&R or portions thereof, the Court will not modify or set aside those portions unless they are clearly erroneous or contrary to law.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72; *Johnson v. Zema Systems Corp.*, 170 F.3d 734, 739 (7th Cir. 1999); *Conley v. Crabtree*, 14 F. Supp. 2d 1203, 1204 (D. Or. 1998).

On September 19,  2007, both parties stipulated to allow the Plaintiff until October 5, 2007 to file an objection to the R&R.  Plaintiff then filed a timely objection on October 5, 2007, objecting to the R&R on the claims of First Amendment retaliation and denial of due process–Plaintiff has not objected to the R&R on the FMLA claim.  This Court finds

that Magistrate Judge Guerin was not clearly erroneous as to those parts of the R&R that were not objected to. After a de novo review of those sections that the Plaintiff objected to, the R&R is adopted in part and rejected in part.

**Summary Judgment Standard**

In deciding a motion for summary judgment, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the party opposing the motion. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Eisenberg v. Insurance Co. of North America*, 815 F.2d 1285, 1289 (9th Cir. 1987). Summary judgment is appropriate if the pleadings and supporting documents "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Material facts are those "that might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248. A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

A party moving for summary judgment initially must demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 325. The moving party merely needs to point out to the Court the absence of evidence supporting its opponent's claim; it does not need to disprove its opponent's claim. *Id.*; *see also* Fed. R. Civ. P. 56(c).

If a moving party has made this showing, the nonmoving party "may not rest

upon the mere allegations or denials of the adverse party's pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). *See also Anderson*, 477 U.S. at 256; *Brinson v. Linda Rose Joint Venture*, 53 F.3d 1044, 1049 (9th Cir. 1995). The nonmoving party may not "replace conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 888 (1990).

*Legal Analysis*

**Plaintiff's Objections**

**1. First Amendment Retaliation**

In the R&R, the Magistrate Judge determined that the Plaintiff failed to establish a prima facie case of retaliation for exercising his First Amendment rights because the Plaintiff failed the third prong of the test set forth in *Thomas v. City of Beaverton* that requires that: (1) Plaintiff engaged in protected speech; (2) Defendants took an "adverse employment action" against Plaintiff; and (3) Plaintiff's speech was a "substantial or motivating" factor for the adverse employment action. 379 F.3d 802, 808-09 (9th Cir. 2004) (citing *Coszalter v. City of Salem*, 320 F.3d 968, 973 (9th Cir. 2003)). A plaintiff can prove that the protected speech was a substantial or motivating factor for the adverse employment action three ways: (1) through evidence regarding the "proximity in time between the protected action and the allegedly retaliatory employment decision;" (2) through evidence that "his employer expressed opposition to his speech, either to him or to others;" or (3) through evidence that the "employer's proffered explanations for the

adverse employment action were false and pre-textual." *Coszalter*, 320 F.3d at 974. While adverse employment actions are a question of fact for the jury, summary judgment may be appropriate when the totality of the facts present such a clear picture that it would be unreasonable for a jury to find otherwise. *Id*. at 978.

   *A. Proximity in Time*

   Timing alone cannot prove causation unless the adverse employment action occurred 'fairly soon after the employee's protected expression.'" *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1065 (9th Cir. 2002). The last known time that Plaintiff criticized the behavior of the Logic and Accuracy Board was in November 1998. Plaintiff was informed of his termination in June of 2000, and was allowed to stay on until September of 2000, in hopes that he would be able to find other employment before he was released. Nineteen months passed between Plaintiff's protected speech and the adverse employment action. An eighteen-month gap between the protected speech and the adverse employment action has been found to be too long, by itself, to allow a reasonable jury to conclude that Plaintiff's speech gave rise to the adverse employment action. *Id.* Here, a nineteen-month gap existed between the protected speech and the adverse employment action. Plaintiff's bold-faced assertion that the "closeness in time . . . can not [sic] be denied," is insufficient to allow a jury to find otherwise. (Doc. No. 150)

   Plaintiff implies that he suffered an adverse employment action when he was placed in the temporary position with the Risk Management Project. An adverse employment action is any employment action that is used to deter further protected

speech. *Ray v. Henderson*, 217F.3d 1234, 1242-43 (9th Cir. 2000). Adverse employment actions are not limited to termination and may include actions such as hires, transfers, promotions, demotions, etc. *Id*. If, as Plaintiff suggests, Ms. Deering-Szalay was in the "final steps" of procuring a permanent position for Plaintiff when the placement in the temporary Risk Management Position occurred it could constitute an adverse employment action. Unfortunately, Plaintiff only provides evidence that Ms. Deering-Szalay was trying to place Plaintiff in a permanent position. There is no evidence that Ms. Deering-Szalay had found or was close to finding a permanent position for Plaintiff.

      B. *Evidence that Plaintiff's employer expressed opposition to his speech*

Plaintiff provides evidence that on separate occasions Mr. Parker and Mr. Barry made negative comments about his work with the Logic and Accuracy Board. Mr. Parker's comments are not probative of causation because he had no say as to whether the CIP should retain Plaintiff. It should also be noted that Mr. Parker funded the CIP position for an additional four months in an effort to afford Plaintiff an opportunity to find other employment before being terminated. While Plaintiff's termination was recommended by Mr. Esak, who had no knowledge of the Plaintiff's protected speech, it was Mr. Barry–who both knew of Plaintiff's protected speech and made negative comments about it–who made the final decision to terminate Plaintiff's position within the CIP. This is not strong causation evidence, but it is sufficient to survive a motion for summary judgment.

      C. *Evidence that Defendants' proffered explanations for the adverse employment*

*action were false and pre-textual*

Plaintiff offers no evidence that Defendants' proffered explanation was mere pretext.  Plaintiff contends that there is substantial evidence of pretext because "the very promotion that Huckleberry stated under oath would not occur, does, but is coupled with a mandatory relinquishment of all merit system rights?"  (Plaintiff's Response 12). Plaintiff claims that at the time he was hired by the CIP he was told that if he refused the position he would be laid off.  This evidence is insufficient for a reasonable jury to find in Plaintiff's favor.  Plaintiff never disputed Defendants' claim that when Plaintiff was offered the CIP position he was told that there were other available classified positions that paid less.  Plaintiff cannot now, at the twelfth hour, claim that he was not told about the other classified jobs.  "Uncorroborated, self-serving testimony is insufficient to prevent entry of summary judgement."  *Villarimo*, 281 F.3d at 1061.  Additionally, even if Plaintiff was told that he would be laid off if he did not take the CIP position, it would not have been inconsistent with treatment of other employees because he had already been a part of the JRPP for over a year and therefore would have been subject to lay-off regardless.

Plaintiff also claims that causation was established by the Plaintiff's "excellent job performance rating, the production of the requested database, [and] no formal or informal performance assessment."  Plaintiff's excellent job performance ratings do not show pretext because all but one performance rating was before the Plaintiff worked for the CIP.  The sole performance rating during the CIP period was completed by Ms. Deering-

Szalay, who played no role in supervising Plaintiff and as Plaintiff's wife, cannot be considered an impartial party. Plaintiff's production of the Risk Management database is irrelevant because it says nothing about his performance on the CIP. Finally, that Plaintiff received no formal or informal performance assessment only shows that he was not told about his performance, not that he was performing up to standard.

However, because Mr. Barry's negative comments about Plaintiff's protected speech and his involvement in Plaintiff's termination provide some evidence of retaliation, summary judgment is not appropriate on this claim.

**2. Denial of Due Process**

Plaintiff was not denied due process because he was not under duress when he relinquished his classified status. Plaintiff concedes that unclassified employees do not receive the protection of the merit system. Plaintiff claims that he had a property interest in his merit system rights and only relinquished them because he was told that he would be laid off if he refused to take the CIP position. This claim is tenuous at best. Plaintiff's only evidence of this is a statement made by Plaintiff after his deposition. Plaintiff also never disputed Defendants' evidence that at the time Plaintiff was offered the CIP position he was told that there were other available classified positions. Plaintiff's last minute, uncorroborated, self-serving assertions are insufficient for a reasonable jury to find for Plaintiff.

Additionally, Plaintiff's assertions are insufficient to prove duress. The goal of the

JRPP is to take injured employees and find them new employment with a year.  After a year has passed, an employee that has not found a new position is subject to lay-off .  When Plaintiff was offered the CIP position he had been a member of the JRPP for well over a year.  Under these circumstances Defendant could have simply laid Plaintiff off. Defendant did not put Plaintiff in a financially challenged position where Plaintiff was forced to except Defendants' unfair proposal.  Instead Defendant gave Plaintiff an opportunity it was not required to give.

For the foregoing reasons,

**IT IS ORDERED** that the Magistrate Judge's Report and Recommendation filed September 5, 2007, is **ADOPTED IN PART AND REJECTED IN PART.**

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment [Doc. No. 128] is **GRANTED IN PART AND DENIED IN PART**.

DATED this 28th day of March, 2008.

_____
John M. Roll
Chief United States District Judge